[No. C007091. Third Dist. Jan. 30, 1991.]

SIERRA-BAY FEDERAL LAND BANK ASSOCIATION et al., Petitioners, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, Respondent;
DAN S. CIABATTARI, Real Party in Interest.

COUNSEL

Tennant, Parshall, Read & Dutra and Michael B. Read for Petitioners.

No appearance for Respondent.

Souza, Coats, McInnis & Mehlhaff and Robert Mehlhaff for Real Party in Interest.

OPINION

SPARKS, Acting P. J.—In this original proceeding petitioners, Sierra-Bay Federal Land Bank Association, R. Lewis Ward, William S. Bensley, and Western Farm Credit Bank, seek a peremptory writ of mandate directing the respondent superior court to vacate its decision overruling their demurrer to real party in interest, Dan S. Ciabattari's, first amended complaint and to enter a new order granting the demurrer.[1] This action arises out of the exercise of the power of sale in certain deeds of trust after plaintiff failed to repay loans obtained under the federal Farm Credit System. (12 U.S.C. § 2001 et seq.) Plaintiff alleges that defendants failed to comply with certain provisions of the Farm Credit Act of 1971 (Act), as amended by the Agricultural Credit Act of 1987, which would have precluded foreclosure. In overruling the demurrer the trial court reasoned that there may be a federal cause of action created by the Agricultural Credit Act of 1987, and that in any event the complaint stated a cause of action for negligence. In light of a subsequent decision of the federal Ninth Circuit Court of Appeals, it now appears that there is no express or implied private cause of action under federal law. We conclude that plaintiff cannot pursue a state cause of action for damages based upon alleged violations of the federal Act, and this is true regardless whether he attempts to frame his claim as a cause of action for negligence. Accordingly, we will issue a peremptory writ of mandate.

LEGAL AND FACTUAL BACKGROUND

Since the early years of this century the federal government has made efforts to meet rural credit needs through the Farm Credit System. (11 Harl, Agricultural Law, § 100.01[2], p. 100-4.) The Farm Credit System is made

---

[1] For convenience we will refer to the parties by their designations in the litigation below. Thus real party in interest Dan S. Ciabattari will be referred to as plaintiff, and petitioners Sierra-Bay Federal Land Bank Association et al., will be referred to collectively as defendants.

up of federal land banks and federal land bank associations, federal intermediate credit banks and production credit associations, and banks for cooperatives, which are supervised and coordinated by the Farm Credit Administration, an independent agency in the executive branch of the federal government. (*Id.* at § 100.02, p. 100-9.) The system was originally government financed but had as an early objective complete farmer ownership through stock purchase. That objective was realized in 1968 and the entities in the Farm Credit System are now privately owned. (*Id.* at p. 100-6, fn. 14.) The Farm Credit System is currently governed by the Farm Credit Act of 1971, as amended. (12 U.S.C. § 2001 et seq.)

This litigation arises out of the amendments to the Farm Credit Act of 1971 which are contained in the Agricultural Credit Act of 1987. Those amendments were enacted in response to a crisis in the Farm Credit System. They were intended to provide meaningful assistance to the system and to minimize the possible exposure of the federal budget. (*Harper v. Federal Land Bank of Spokane* (9th Cir. 1989) 878 F.2d 1172, 1174-1175.) The amendments are wide ranging. Among other things, they establish the Farm Credit System Assistance Board impressed with the duty "to carry out a program to provide assistance to, and protect the stock of borrowers of, the institutions of the Farm Credit System, and to assist in restoring System institutions to economic viability and permitting such institutions to continue to provide credit to farmers, ranchers, and the cooperatives of such, at reasonable and competitive rates." (12 U.S.C. § 2278a-1.)

The Agricultural Credit Act of 1987 includes some provisions which could prove to be of benefit to certain distressed borrowers. In title 12, United States Code, section 2202a, (unless otherwise noted all further section references are to title 12 of the United States Code), Congress provided for restructuring distressed loans. "The term 'distressed loan' means a loan that the borrower does not have the financial capacity to pay according to its terms and that exhibits one or more of the following characteristics: [¶] (A) The borrower is demonstrating adverse financial and repayment trends. [¶] (B) The loan is delinquent or past due under the terms of the loan contract. [¶] (C) One or both of the factors listed in subparagraphs (A) and (B), together with inadequate collateralization, present a high probability of loss to the lender." (§ 2202a(a)(3).) Under the Act restructuring includes "rescheduling, reamortization, renewal, deferral of principal or interest, monetary concessions, and the taking of any other action to modify the terms of, or forbear on, a loan in any way that will make it probable that the operations of the borrower will become financially viable." (§ 2202a(a)(7).)

The Act makes it clear that a lender need not absorb a loss by restructuring a loan. However, under the Act a loss to the lender is not gauged by whether the lender will lose money on the original loan, but by whether foreclosing will net the lender less than restructuring the loan. This is determined by comparing the potential cost of foreclosure and the potential cost of restructuring in accordance with a proposed plan. The Act provides that if the potential cost of restructuring is less than or equal to the potential cost of foreclosure then the lender "shall" restructure the loan. (§ 2202a(e)(1).) However, the Act also provides that such a comparison is only one of several factors to be considered. Other factors include whether the borrower is applying all income over and above necessary and reasonable living and operating expenses to the payment of primary obligations; whether the borrower has the financial capacity and the management skills to protect the collateral from diversion, dissipation, or deterioration; whether the borrower is capable of working out existing financial difficulties, reestablishing a viable operation, and repaying the loan on a rescheduled basis; and in the case of a distressed loan that is not delinquent, whether restructuring consistent with sound lending practices may be taken to reasonably ensure that the loan will not become a loan that is necessary to place in nonaccrual status. (§ 2202a(d)(1).) If more than one restructuring alternative is available then the plan which entails the least cost to the lender is the one which is to be adopted. (§ 2202a(f).)

The determination whether the cost of foreclosure exceeds the cost of restructuring requires consideration of a broad list of factors, some of which cannot be reduced to a precise numerical formula and which thus require the exercise of judgment. "The term 'cost of foreclosure' includes—[¶] (A) the difference between the outstanding balance due on a loan made by a qualified lender and liquidation value of the loan, taking into consideration the borrower's repayment capacity and the liquidation value of the collateral used to secure the loan; [¶] (B) the estimated cost of maintaining a loan as a nonperforming asset; [¶] (C) the estimated cost of administrative and legal actions necessary to foreclose a loan and dispose of property acquired as the result of the foreclosure, including attorneys' fees and court costs; [¶] (D) the estimated cost of changes in the value of collateral used to secure a loan during the period beginning on the date of the initiation of an action to foreclose or liquidate the loan and ending on the date of the disposition of the collateral; and [¶] (E) all other costs incurred as the result of the foreclosure or liquidation of a loan." (§ 2202a(a)(2).) The determination whether this cost exceeds the cost of restructuring requires consideration of "all relevant factors, including—[¶] (A) the present value of interest income and principal forgone by the lender in carrying out the restructuring plan; [¶] (B) reasonable and necessary administrative expenses involved in

working with the borrower to finalize and implement the restructuring plan; [¶] (C) whether the borrower has presented a preliminary restructuring plan and cash-flow analysis taking into account income from all sources to be applied to the debt and all assets to be pledged, showing a reasonable probability that orderly debt retirement will occur as a result of the proposed restructuring; and [¶] (D) whether the borrower has furnished or is willing to furnish complete and current financial statements in a form acceptable to the institution." (§ 2202a(e)(2.)

Under the Act each bank's board of directors was required to develop a policy to govern the restructuring of distressed loans. (§ 2202a(g).) A lender is required to provide notice that a loan may be suitable for restructuring together with a copy of its policy whenever it determines that a loan is a distressed loan, and not later than 45 days before beginning foreclosure proceedings. (§ 2202a(b)(1), (2).) A borrower is permitted to file an application for restructuring, although the lender may propose restructuring even in the absence of an application. (§ 2202a(a)(1), (d)(2).) The Act provides that a lender may not foreclose or continue a foreclosure proceeding with respect to a distressed loan before completing any pending consideration for restructuring the loan. (§ 2202(b)(3).) However, if the lender has reasonable grounds to believe that the loan collateral will be destroyed, dissipated, consumed, concealed, or permanently removed from the state, then it may foreclose or take other legal action at any time. (§ 2202a(j).)

Under the Act each lender must establish one or more credit review committees, which must include farmer board representation. (§ 2202(a)(1).) A loan officer involved in the initial decision on a loan may not serve on the credit review committee when it reviews such loan. (§ 2202(a)(2).) When a decision is made on a request for restructuring, the lender must provide the borrower with prompt written notice of the action taken and, if restructuring is denied, the reasons for the denial and notice of the right to review by the credit review committee. (§ 2201(b).) Within seven days of receiving the notice the borrower may request a review before the credit review committee. (§ 2202(b)(2).) The borrower may appear in person before the credit review committee and may be accompanied by counsel or any other representative. (§ 2202(c).) The borrower may request an independent appraisal. (§ 2202(d).) The credit review committee must notify the borrower in writing of its decision and the reasons for its decision. (§ 2202(e).)

In the event a borrower does not have financial resources to avoid foreclosure and the lender acquires property through foreclosure or by voluntary conveyance from the borrower, then the borrower has certain "first

refusal" rights with respect to the property. If the lender decides to sell the property the former owner may make an offer to purchase it at the appraised value or some lesser sum. (§ 2219a(a), (b).) The lender must accept an offer to purchase at the appraised value. (§ 2219a(b)(3).) The lender need not accept an offer to purchase at less than the appraised value but may not thereafter sell the property to another person for a sum less than or equal to the offer or on different terms and conditions without first offering the former owner the opportunity to purchase at that price or upon those conditions. (§ 2219a(b)(5).) For purposes of these provisions financing by a Farm Credit System institution is not to be considered a term or condition of a sale of acquired real estate and a lender is not required to provide financing to a previous owner in connection with the sale of acquired property. (§ 2219a(e), (f).)

If a lender decides to lease the property then the former owner may offer to lease it at the appraised rental value or some lesser sum. (§ 2219a(c)(1).) If the former owner has the resources available to conduct a successful farming operation and can meet all of the payments, terms and conditions of the lease, then the lender must lease the property to him at the appraised rental value. (§ 2219a(c)(3).) The lender need not accept an offer to lease the property at less than the appraised rental, but thereafter may not lease the property to someone else at less than that offered by the former owner or upon different terms and conditions without first giving the former owner the opportunity to lease the property at that price and upon those terms and conditions. (§ 2219a(c)(6)(A).)

The Farm Credit Administration has the authority to compel compliance with these provisions. It may issue a directive requiring compliance. (§ 2202a(i).) It may issue cease and desist orders and may apply to a federal court for an injunction to enforce such orders. (§§ 2261-2263.) A director or officer may be suspended or removed from office. (§ 2264.) Civil penalties may be imposed. (§ 2268.) And in some instances criminal sanctions may be available. (§ 2269.)

It is against this legal backdrop that plaintiff filed his complaint. ▮ Since in this original proceeding we are asked to find that the trial court erred in overruling defendants' demurrer to plaintiff's complaint, and to direct the trial court to issue an order granting the demurrer, we will apply the standard of review appropriate to a demurrer. Thus, we will accept as true all properly pleaded facts in the complaint. (*Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 493 [220 Cal.Rptr. 818, 709 P.2d 837]; *Executive Landscape Corp.* v. *San Vicente Country Villas IV Assn.* (1983)

145 Cal.App.3d 496, 499 [193 Cal.Rptr. 377].) So read, the complaint sets forth the following scenario:

Plaintiff engages in farming as an individual and as sole shareholder of two corporations. In 1981 plaintiff obtained a loan (loan 1) from the defendant members of the Farm Credit System. In 1982 plaintiff obtained another loan (loan 2) from the defendants. The loans were secured by different parcels of real property. In October 1987 plaintiff received notices of default and elections to sell under the deeds of trust securing both loans. In April 1988 plaintiff received notices of trustee's sales under both deeds of trust. The notice of trustee's sale with respect to loan 1 listed the total of all principal, interest, fees and expenses owing as $2,676,926.18. The notice of trustee's sale with respect to loan 2 listed the total of all principal, interest, fees and expenses owing as $1,766,774.40. The sales were continued until November 1988, at which time trustee's sales were conducted with respect to both deeds of trust. Plaintiff alleges that the defendant bank became the purchaser at both trustee's sales. In December 1988 defendants appraised the land which had secured loan 1 at $2,190,000, and the land which had secured loan 2 at $771,100.

Plaintiff alleges that both of his loans were distressed loans within the meaning of the Agricultural Credit Act of 1987. In December 1987, after receiving the notices of default, plaintiff submitted his first application for forbearance and restructure of the loans. Plaintiff alleges that the value of the proposed restructure of loan 1 was $2,270,461.21, and the value of the proposed restructure of loan 2 was $1,498,948.65. Plaintiff alleges that under the circumstances the cost of foreclosure exceeded the cost of his restructuring proposal, but that the defendants negligently, arbitrarily and capriciously failed to perform their duties under the Agricultural Credit Act of 1987.

In May 1988 plaintiff submitted his second application for forbearance and restructure. He alleges that under this proposal the cost of foreclosure exceeded the cost of restructure. He asserts that defendants once again negligently, arbitrarily and capriciously failed to consider and accept this restructuring proposal.

Plaintiff alleges that on or about June 15, 1988, without providing notice of any kind, the defendants denied his first restructure proposal. On June 28, 1988, plaintiff requested a review of the denial of his proposal. He asserts that the defendants negligently, arbitrarily, and capriciously failed to provide a review by a credit review committee. Plaintiff makes identical allegations with respect to his second proposal for restructuring.

Plaintiff finally alleges that in November 1988 he submitted an offer to lease the subject property at a rental that was at or in excess of the fair rental value of the property. He alleges that the defendants negligently, arbitrarily and capriciously failed to lease the subject property to him.[2]

Based upon these allegations plaintiff alleged five causes of action sounding in negligence, one each for the failure to accept his first restructure proposal, the failure to accept his second restructure proposal, the failure to review the denial of his first proposal, the failure to review the denial of his second proposal, and for the failure to lease the property to him after foreclosure. Plaintiff added a cause of action to quiet title, asserting that the trustees' sales of the properties are invalid.

## DISCUSSION

### I. *Federal Causes of Action.*

Although plaintiff did not purport to state a cause of action based solely on the federal Farm Credit Act, the trial court nevertheless determined that there were two issues before it. "The first is whether there is a private right of action implied by the 1987 amendments to the Farm Credit Act. The second is whether [plaintiff] can plead a state tort action based on breach of the Farm Credit Act." At the time defendants filed their demurrer to plaintiff's complaint a federal district court had held that there is an implied federal cause of action to enforce the provisions of the Agricultural Credit Act of 1987. (*Harper* v. *Federal Land Bank of Spokane* (D.Ore. 1988) 692 F.Supp. 1244, 1249.) ■ In overruling the demurrer the trial court recognized that the decision in *Harper* was on appeal to the Ninth Circuit Court of Appeals and held that if *Harper* were affirmed then plaintiff would have stated claims under the Act. But *Harper* was not affirmed. In fact, shortly before the court ruled on this demurrer the Ninth Circuit rendered its decision reversing the trial court decision in *Harper*. (*Harper* v. *Federal Land Bank of Spokane, supra*, 878 F.2d at p. 1177.) The appellate court held that there is no implied private cause of action to enforce the provisions of the Farm Credit Act of 1971, as amended by the Agricultural Credit Act of 1987. Rather, the administrative remedies provided by the statutory scheme are the exclusive remedies for alleged violations of the law. (*Id.* at pp. 1176-1177.) The appellate court's decision in *Harper* is

---

[2] Under the Agricultural Credit Act of 1987, the lease-back right of first refusal applies only after the lender makes a decision to hold the property and lease it out. (§ 2219a(c)(1).) Plaintiff's allegations are deficient in that he has not alleged that the defendants made such a decision. But this defect may be curable by amendment if plaintiff could otherwise state a cause of action.

consistent with the majority of federal courts which have considered the question. (See *Griffin* v. *Federal Land Bank of Wichita* (10th Cir. 1990) 902 F.2d 22, 23-24; *Schroder* v. *Volcker* (10th Cir. 1988) 864 F.2d 97, 98; *Mendel* v. *Production Credit Ass'n of the Midlands* (8th Cir. 1988) 862 F.2d 180, 182 [considering the 1985 amendments to the Farm Credit Act]; *Redd* v. *Federal Land Bank of St. Louis* (8th Cir. 1988) 851 F.2d 219, 223 [same]; *Bowling* v. *Block* (6th Cir. 1986) 785 F.2d 556 [considering the Farm Credit Act]; *Smith* v. *Russellville Production Credit Ass'n* (11th Cir. 1985) 777 F.2d 1544, 1548 [same]. But see *Zajac* v. *Federal Land Bank of St. Paul* (8th Cir. 1989) 887 F.2d 844, 856-857, rehg. en banc granted.[3]) We are satisfied that plaintiff cannot state a federal cause of action under the Agricultural Credit Act of 1987. In fact, in his response to the petition for a writ of mandate plaintiff has abandoned this theory by failing to make any argument in its support.

## II. *State Causes of Action.*

For his state causes of action sounding in negligence plaintiff relies upon Evidence Code section 669, which provides:

"(a) The failure of a person to exercise due care is presumed if:

"(1) He violated a statute, ordinance, or regulation of a public entity;

"(2) The violation proximately caused death or injury to person or property;

"(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and

"(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

---

[3] In *Zajac*, the court, in a divided opinion, held that a farmer borrower could proceed with a private action to enforce the procedural provisions of the Agricultural Credit Act of 1987. While that decision was vacated pending a rehearing en banc, even if the full court adheres to the majority decision that result would not avail plaintiff. The court in *Zajac* was careful to limit its holding to an action for specific injunctive relief to compel a lender to comply with the procedural provisions of the act, in that case the appointment of an independent appraiser. The court said that it would not permit an action to proceed into the merits of a credit decision where procedural requirements are fulfilled, and "[m]oreover, we have not held that damages are available." (887 F.2d at p. 857, especially fn. 16.) The decision in *Zajac* does not support plaintiff's claim for damages.

"(b) This presumption may be rebutted by proof that:

"(1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; or

"(2) The person violating the statute, ordinance, or regulation was a child and exercised the degree of care ordinarily exercised by persons of his maturity, intelligence, and capacity under similar circumstances, but the presumption may not be rebutted by such proof if the violation occurred in the course of an activity normally engaged in only by adults and requiring adult qualifications."

 Under this statute then "a presumption of negligence arises from the violation of a statute which was enacted to protect a class of persons of which the plaintiff is a member against the type of harm which the plaintiff suffered as a result of the violation of the statute." (*Vesely* v. *Sager* (1971) 5 Cal.3d 153, 164 [95 Cal.Rptr. 623, 486 P.2d 151].) Plaintiff asserts that he falls within the ambit of Evidence Code section 669 because he has alleged a violation of federal statutory law, that the violation caused the loss of his property through foreclosure, that this loss through foreclosure was the injury the legislation was designed to prevent, and that he is a member of the class for whose protection the statutory scheme was adopted. He argues that these allegations are sufficient to set forth a cause of action for presumptive negligence.

Plaintiff's assertion is unique and anomalous. It presents a type of situation rarely encountered, and generally restricted to choice-of-law questions. In short, plaintiff points to the laws of two jurisdictions, neither one of which recognizes a statutory cause of action in these circumstances. He takes a portion of the law of one jurisdiction and attempts to engraft it onto the law of the other, and thus to create a cause of action which neither jurisdiction would otherwise recognize.

 In the conflict-of-law arena, where we would be confronted with the laws of two separate but equal jurisdictions, we would apply a governmental interest analysis, considering each jurisdiction's relevant contacts with the parties, property and the incident involved in order to compare the genuine interest of each jurisdiction in having its laws applied. (See 12 Cal.Jur.3d, Conflict of Laws, § 19, pp. 498-499.) In doing so we would place primary emphasis on the interests of our own jurisdiction and would apply the law of another only if our state's interest in having its law applied was insignificant or if the other state's law did not conflict with our state's interests.

(*Ibid.* See *California Casualty Indemnity Exchange* v. *Pettis* (1987) 193 Cal.App.3d 1597, 1605-1606 [239 Cal.Rptr. 205].) In contrast, in this case we are confronted with the laws of overlapping state and federal jurisdictions. In determining the appropriate result we are not free to give our state law primacy but must proceed with an awareness that our law must yield if the application of our law would stand as an obstacle to the accomplishment of the full purposes that the federal law seeks to achieve. (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630].) ■ For reasons we shall explain, we conclude that plaintiff cannot state a cause of action for damages for negligence in these circumstances.

Initially we note that this case is not strictly analogous to the authorities plaintiff relies upon. ■ Those authorities, according to plaintiff, establish that a federal statute or regulation may be adopted as a standard of care in a state negligence action under Evidence Code section 669. Of that there is no doubt. For example, in *Toole* v. *Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689 [60 Cal.Rptr. 398, 29 A.L.R.3d 988], at pages 703 and 704, the plaintiff suffered personal injury from using a drug manufactured and marketed by the defendant. The plaintiff presented evidence that in placing the drug on the market the defendant had violated certain provisions of the federal Food, Drug, and Cosmetic Act relating to investigations to determine whether the drug was safe for use. The defendant objected to consideration of the federal act since Congress had failed to provide for a private cause of action for breach of the act. However, the Court of Appeal noted that the plaintiff was not seeking damages for breach of the federal statute but was merely urging adoption of the federal standard as the standard of care in his state negligence action. This was proper. Likewise, in *McGee* v. *Cessna Aircraft Co.* (1983) 139 Cal.App.3d 179 [188 Cal.Rptr. 542], at pages 186 and 187, the plaintiff was allowed to rely upon the violation of a federal aviation regulation to establish presumptive negligence under Evidence Code section 669. (See also *Elsworth* v. *Beech Aircraft Corp., supra,* 37 Cal.3d at pp. 549-551.)

In these cases, and in others of their ilk, the plaintiffs were pursuing recognized state causes of action for personal injury based upon negligence. They sought to rely upon federal safety standards in aid of establishing their right to recovery. ■ As the California Supreme Court said early on in *Clinkscales* v. *Carver* (1943) 22 Cal.2d 72 [136 P.2d 777], at page 75, with citations omitted: "A suit for damages is based on the theory that the conduct inflicting the injuries is a common-law tort, in this case the failure to exercise the care of a reasonable man . . . . The significance of the statute in a civil suit for negligence lies in its formulation of a standard of

conduct that the court adopts in the determination of such liability . . . . In the absence of such a standard the case goes to the jury, which must determine whether the defendant has acted as a reasonably prudent man would act in similar circumstances. The jury then has the burden of deciding not only what the facts are but what the unformulated standard is of reasonable conduct. When a legislative body has generalized a standard from the experience of the community and prohibits conduct that is likely to cause harm, the court accepts the formulated standards and applies them . . . , except where they would serve to impose liability without fault."

▬ The adoption of a statutory standard of conduct in a negligence action may well result in the imposition of liability where none might otherwise be imposed. This is so because the statutorily established standard of care may be more exacting than the standard a defendant might be able to convince a jury that a reasonable person would follow. In addition, a statute may impose a duty where none existed at common law. "A duty of care, and the attendant standard of conduct required of a reasonable man, may of course be found in a legislative enactment which does not provide for civil liability." (*Vesely* v. *Sager, supra*, 5 Cal.3d 153, 164; see also, Holdych, *The Presumption of Negligence Rule in California: The Common Law and Evidence Code Section 669* (1980) 11 Pacific L.J. 907, 920-923.) Nevertheless, it is the tort of negligence, and not the violation of the statute itself, which entitles a plaintiff to recover civil damages.[4] ▬ ▬ ▬ ▬
▬ In such circumstances the plaintiff is not attempting to pursue a private cause of action for violation of the statute; rather, he is pursuing a negligence action and is relying upon the violation of a statute, ordinance, or regulation to establish part of that cause of action.[5] Nearly all the cases in

---

[4] One commentator has argued that "[s]ince the presumption arises to determine the existence of negligence, it should not apply to statutes adopted to protect people against certain types of harm where the analogous tort is not that of negligence. The analogous tort may be battery, fraud, trespass, intentional infliction of emotional distress or some other tort." (*The Presumption of Negligence Rule in California: The Common Law and Evidence Code Section 669, supra*, 11 Pacific L.J. at p. 924, fn. 99.) We have no occasion to consider that question in this case.

[5] It is true, of course, that in appropriate cases, a "federal statute may be the basis for an implied right of action for damages resulting from its violation." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 12, p. 71.) As the federal high court has noted, "[i]n determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping. When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the pre-existing remedy."

which the presumption of negligence under Evidence Code section 669 has been applied involve what may be termed "safety" statutes, ordinances or regulations, that is, governmentally designed standards of care intended to protect a particular class of persons from the risk of particular accidental injuries. (See, e.g., *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 763 [91 Cal.Rptr. 745, 478 P.2d 465] [statutory provisions to protect against drowning in a hotel pool]; *Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d 409, 416 [218 P.2d 17] [building code provisions to provide safe egress in the event of fire]; *Cappa* v. *Oscar C. Holmes, Inc.* (1972) 25 Cal.App.3d 978 [102 Cal.Rptr. 207] [industrial safety order requiring guardrails on elevated passageways]; *Olsen* v. *McGillicuddy* (1971) 15 Cal.App.3d 897, 903 [93 Cal.Rptr. 530] [city ordinance to protect against injury from BB guns]; *Whinery* v. *Southern Pac. Co.* (1970) 6 Cal.App.3d 126, 128-129 [85 Cal.Rptr. 649] [city ordinance limiting the speed of trains to prevent collisions]; see also 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 820, pp. 173-174 [collecting cases].)

■ In contrast to the usual situation in which Evidence Code section 669 applies, the plaintiff here has not been subjected to accidental injury and he is not pursuing an otherwise recognized cause of action with reliance upon a standard of care incorporated from a safety statute or regulation. Instead, plaintiff relies upon economic legislation intended by Congress to guide the credit decisions of the component members of the Farm Credit System. If we disregard for a moment the allegations concerning federal law, then plaintiff's complaint simply alleges that he obtained loans from defendants and that he gave them deeds of trust on real property to secure his performance. He defaulted on the loans and the defendants exercised the powers of sale in the deeds of trust. These allegations do not even hint at a viable cause of action for negligence under the law of this state. A commercial lender is not to be regarded as the guarantor of a borrower's success and is not liable for the hardships which may befall a borrower. (*Wagner* v. *Benson* (1980) 101 Cal.App.3d 27, 34 [161 Cal.Rptr. 516].) It is simply not tortious for a commercial lender to lend money, take collateral, or to foreclose on collateral when a debt is not paid. (*Ibid.*; *Kinner* v. *World Sav. & Loan Assn.* (1976) 57 Cal.App.3d 724, 728-734 [129 Cal.Rptr. 400]; *Drake* v. *Morris Plan Co.* (1975) 53 Cal.App.3d 208, 211-212 [125 Cal.Rptr. 667]; *Fox & Carskadon Financial Corp.* v. *San Francisco Fed. Sav. & Loan Assn.* (1975) 52 Cal.App.3d 484, 489 [125 Cal.Rptr. 549].) And in this state a commercial lender is privileged to pursue its own economic interests and

(*Merrill Lynch, Pierce, Fenner & Smith* v. *Curran* (1982) 456 U.S. 353, 378-379 [72 L.Ed.2d 182, 201, 102 S.Ct. 1825] fn. omitted.) But as we have noted, the federal courts have uniformly, and in our view correctly, determined that there is no implied private cause of action to enforce the provisions of the Farm Credit Act of 1971.

may properly assert its contractual rights. (*Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 67 [248 Cal.Rptr. 217].)

In view of these authorities and the facts alleged in plaintiff's complaint, it is clear that he is not pursuing a negligence action in which he urges adoption of a congressionally devised standard of care. Instead, he is simply pursuing a private cause of action for damages based upon the alleged violation of federal law. The question is whether this state should permit plaintiff to pursue a private cause of action for damages for the violation of federal law when the federal government itself has declined to recognize such a cause of action. It has been said that "systemwide requirements of the Agricultural Credit Act of 1987, such as restructuring, are not only uniquely federal; such provisions are absolutely federal." (*Zajac* v. *Federal Land Bank of St. Paul, supra,* 887 F.2d at p. 856.) It would be anomalous for a state to recognize a private cause of action for damages for the violation of such a uniquely and absolutely federal law where the federal government has refused to permit such an action. In any event, anomaly aside, when we give due consideration to the purposes of the federal statutory scheme, we are convinced that we may not permit this action to proceed.

 The 1987 amendments to the Farm Credit Act included provisions which might benefit some farmers but it did so as part of a comprehensive congressional plan to restore financial integrity to the Farm Credit System and to minimize the possible exposure of the federal budget. (*Harper* v. *Federal Land Bank of Spokane, supra,* 878 F.2d at p. 1175.) As the *Harper* court observed: "[T]he primary purpose of the 1987 Act was to restore financial integrity to the Farm Credit System. Allowing a private right of action undermines that objective by involving the Farm Credit System in costly litigation." (*Id.* at p. 1177.) This is particularly true in view of the fact that the statutory standards under the Act are sufficiently undefined so that decisions under the law necessarily require the exercise of judgment and discretion, and perhaps even studied guesswork. And, of course, the recognition of a state cause of action for damages based upon alleged violations of the Act would undermine the primary purposes of the Act just as certainly as would recognition of a federal private right of action. Since we may not recognize a state cause of action if to do so would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress (*Elsworth* v. *Beech Aircraft Corp., supra,* 37 Cal.3d at p. 548; see *Pacific Gas & Elec.* v. *Energy Resources Comm'n* (1983) 461 U.S. 190, 203-204 [75 L.Ed.2d 752, 765, 103 S.Ct. 1713]), it follows that we may not recognize a private cause of action for damages here.

When plaintiff's attempted reliance upon Evidence Code section 669 is viewed in this light his claim must fail. Even assuming Evidence Code section 669 is not restricted to safety statutes, ordinances or regulations and has sufficient breadth to encompass economic legislation of this nature, a plaintiff must prove four elements in order to establish negligence per se. ■ Plaintiff must show that (1) defendant violated a statute, ordinance or regulation of a public entity, (2) the violation proximately caused his injury, (3) the injury resulted from an occurrence of the nature which the statute was designed to prevent; (4) he was one of the class of persons for whose protection the statute was adopted. (*Capolungo* v. *Bondi* (1986) 179 Cal.App.3d 346, 349-350 [224 Cal.Rptr. 326].) "While the first two elements are normally considered questions for the trier of fact, '[t]he last two elements are determined by the trial court as a matter of law, since they involve statutory interpretation . . . .' " (*Id.* at p. 350.)

Thus, under the negligence per se doctrine now codified in Evidence Code section 669, "violation of a statute gives rise to a presumption of negligence in the absence of justification or excuse, provided that the 'person suffering . . . the injury . . . was one of the class of persons for whose protection the statute . . . was adopted.' " (*Walters* v. *Sloan* (1977) 20 Cal.3d 199, 206-207 [142 Cal.Rptr. 152, 571 P.2d 609].) In short, "for a statute . . . to be relevant to a determination of negligence, not only must the injury be a proximate result of the violation, but the plaintiff must be a member of the class of persons the statute . . . was designed to protect, and the harm must have been one the statute . . . was designed to prevent." (*Stafford* v. *United Farm Workers* (1983) 33 Cal.3d 319, 324 [188 Cal.Rptr. 600, 656 P.2d 564].) Consequently, if one is not within the protected class or the injury did not result from an occurrence of the nature which the transgressed statute was designed to prevent, Evidence Code section 669 has no application. (*Mark* v. *Pacific Gas & Electric Co.* (1972) 7 Cal.3d 170, 183 [101 Cal.Rptr. 908, 496 P.2d 1276]; *Hosking* v. *San Pedro Marine, Inc.* (1979) 98 Cal.App.3d 98, 102 [159 Cal.Rptr. 369]; *Cade* v. *Mid-City Hosp. Corp.* (1975) 45 Cal.App.3d 589, 596-597 [119 Cal.Rptr. 571].)

■ These requirements could be satisfied here only if we were to look at the restructure provisions of the Agricultural Credit Act of 1987 with blinders on and ignore the primary purposes of the act. And, as we have noted, we could not do so without doing violence to the primary purposes of the act. In fact, when the entire 1987 act is considered, it appears that distressed farmers who might qualify for restructuring were incidental beneficiaries of the act. (*Harper* v. *Federal Land Bank of Spokane, supra*, 878 F.2d at pp. 1174-1175, 1177.) Such a status is too attenuated to support the application of presumptive negligence under Evidence Code section 669.

(See *Stafford* v. *United Farm Workers, supra*, 33 Cal.3d at p. 324; *Cade* v. *Mid-City Hosp. Corp., supra*, 45 Cal.App.3d at p. 598; *Atkins* v. *Bisigier* (1971) 16 Cal.App.3d 414, 422 [94 Cal.Rptr. 49].) We conclude that plaintiff cannot state a cause of action for negligence based upon the alleged violation of the Agricultural Credit Act of 1987.

 In addition to his claim for damages plaintiff attempted to state a cause of action to quiet title. He asserts that by reason of defendants' negligence and breach of statutory duty the trustees' sales of the property are invalid and that he still holds title. Our Legislature has extensively regulated the procedures for a foreclosure sale of real property and intends that a properly conducted sale constitutes a final adjudication of the rights of the parties. (*Smith* v. *Allen* (1968) 68 Cal.2d 93, 96 [65 Cal.Rptr. 153, 436 P.2d 65].) A trustee's sale under a deed of trust is presumed to be valid. (*Stevens* v. *Plumas Eureka Annex Min. Co.* (1935) 2 Cal.2d 493, 496-497 [41 P.2d 927]; *Wolfe* v. *Lipsy* (1985) 163 Cal.App.3d 633, 638-639 [209 Cal.Rptr. 801]. See also Civ. Code, § 2924.) Of course, a debtor may apply to a court of equity to set aside a trust deed foreclosure. (*Raedeke* v. *Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 [111 Cal.Rptr. 693, 517 P.2d 1157].) But in order to support such a request the debtor must allege such unfairness or irregularity that, when coupled with the inadequacy of price obtained at the sale, it is appropriate to invalidate the sale. (*Bank of America etc. Assn.* v. *Reidy* (1940) 15 Cal.2d 243, 248 [101 P.2d 77]; *Stafford* v. *Russell* (1953) 117 Cal.App.2d 326, 333 [255 P.2d 814].) And, the debtor must offer to do equity by making a tender or otherwise offering to pay his debt. (*MCA, Inc.* v. *Universal Diversified Enterprises Corp.* (1972) 27 Cal.App.3d 170, 177 [103 Cal.Rptr. 522]; *Karlsen* v. *American Sav. & Loan Assn.* (1971) 15 Cal.App.3d 112, 117 [92 Cal.Rptr. 851].) In his complaint plaintiff does not seek an equitable decree setting aside the trustees' sales and he has not alleged sufficient facts to support such relief. He simply alleges that, due to the failure of defendants to comply with the Agricultural Credit Act of 1987, the trustee's sales are invalid and he retains title. The claim is erroneous and the complaint fails to set forth a cause of action.

## CONCLUSION

We have noted that under federal decisional law a borrower from a member of the federal Farm Credit System cannot maintain a private cause of action for damages based upon alleged violations of the Farm Credit Act of 1971 as amended by the Agricultural Credit Act of 1987. We have concluded that under our state law such a person cannot maintain a cause of action for violations of the acts and this is true regardless whether he

attempts to frame his complaint in the guise of a cause of action for negligence or to quiet title. In this case it is unnecessary for us to go beyond this conclusion and we do not do so. Our law recognizes the power of a court of equity to enjoin a trustee's sale (Civ. Code, § 2924g, subds. (c)(2), (d)), and we have noted that a court of equity may set aside a trustee's sale upon a proper showing. Such equitable actions entail consideration of the entire panoply of circumstances, rights and obligations of the parties. The role that alleged violations of the federal act may have in such an action, if any, is a matter we need not determine here since plaintiff has not sought such relief. We hold only that plaintiff's complaint for damages or to quiet title fails to set forth a claim upon which relief can be granted.

## DISPOSITION

Let a peremptory writ of mandate issue directing the respondent superior court to vacate its decision overruling defendant's demurrer to plaintiff's first amended complaint and to enter a new order sustaining the demurrer. The alternative writ having served its purpose is discharged.

Scotland, J., and DeCristoforo, J.,* concurred.

A petition for a rehearing was denied February 26, 1991, and the petition of real party in interest for review by the Supreme Court was denied May 2, 1991.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.